SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| RICHARD GRAND and MARCIA GRAND, co-trustees of the R.M. Grand Revocable Living Trust, dated January 25, 1991, | ) ) ) ) |
| | ) |
| Plaintiffs/Appellants/Cross-Appellees, | ) ) |
| | ) |
| v. | ) ) |
| | ) |
| JOSEPH P. NACCHIO, a New Jersey resident; JOHN A. McMASTER, a New Jersey resident; QWEST COMMUNICATIONS INTERNATIONAL, INC., a Delaware corporation; and QWEST B.V. a foreign organization, | ) ) ) ) ) ) ) |
| | ) |
| Defendants/Appellees/Cross-Appellants. | ) ) ) ) |

Arizona Supreme Court
No. CV-09-0317-PR

Court of Appeals
Division Two
No. 2 CA-CV 09-0014

Pima County
Superior Court
No. C20025348

**O P I N I O N**

Appeal from the Superior Court in Pima County
The Honorable Carmine Cornelio, Judge

**AFFIRMED**

_____

Opinion of the Court of Appeals, Division Two
222 Ariz. 498, 217 P.3d 1203 (App. 2009)

**AFFIRMED**

_____

TIFFANY & BOSCO, P.A.                                    Phoenix
     By   Richard G. Himelrick

And

MUNGER CHADWICK PLC                                      Tucson
     By   Michael J. Meehan
Attorneys for Richard Grand and Marcia Grand

1

PERKINS COIE BROWN & BAIN P.A.                          Phoenix
     By   Joseph E. Mais
          Brian C. Lake
Attorneys for John P. Nacchio

LEWIS AND ROCA LLP                                      Tucson
     By   John N. Iurino
          Sivan R. Korn
Attorneys for John A. McMaster

FENNEMORE CRAIG, P.C.                                   Phoenix
     By   James D. Burgess
          Timothy Berg

And

BOIES, SCHILLER & FLEXNER LLP                    Washington, DC
     By   Jonathan Sherman
Attorneys for Qwest Communications International, Inc.
and Qwest B.V.

PAUL G. ULRICH, P.C.                                    Phoenix
     By   Paul G. Ulrich
Attorney for Amicus Curiae ML Liquidating Trust
_____

**H U R W I T Z**, Vice Chief Justice

¶1      The issue for decision is whether the defendants "participated in" an allegedly unlawful sale of securities. The courts below held that the defendants did not participate in the sale. We agree.

**I.**

¶2      In 1999, Koninklijke KPN N.V. and Qwest Communications International, Inc. ("Qwest") formed a joint venture, KPNQwest ("KPNQ"). Joseph P. Nacchio was Qwest's CEO and chairman of KPNQ's supervisory board. John A. McMaster, Qwest's former executive vice president, was KPNQ's CEO.

2

¶3     The R.M. Grand Revocable Living Trust ("the Trust") purchased 30,000 shares of stock from KPNQ in the initial public offering ("IPO"). During the following six months, the Trust purchased an additional 255,000 shares of KPNQ from other sellers in the so-called aftermarket.

¶4     After KPNQ failed, the Trust commenced this action against Qwest, Nacchio, and McMaster. As first amended, the complaint alleged common law claims and violations of state and federal securities laws.

¶5     After the superior court dismissed the majority of the first amended complaint, the Trust filed a second amended complaint, alleging violations of Arizona and federal securities laws. The second amended complaint also asserted common law and statutory consumer fraud claims. The Trust sought rescission of the KPNQ stock purchases, and both compensatory and punitive damages.

¶6     The superior court granted partial summary judgment to the defendants, holding that the Trust could not seek either rescission or damages with respect to shares it sold before receiving notice of defendants' allegedly illegal conduct. The Trust then dismissed all claims relating to KPNQ stock it sold after the alleged fraud was discovered. The court of appeals reversed, affirming the superior court's ruling on damages, but

3

reversing with respect to rescission. *Grand v. Nacchio* (*Grand I*), 214 Ariz. 9, 13 ¶ 2, 147 P.3d 763, 767 (App. 2006).

¶7 After remand, the Trust filed a third amended complaint, which alleged only state securities law claims and sought only rescissory damages. The gravamen of the third amended complaint was that the defendants had fraudulently overstated Qwest's earnings, and that the Trust would not have purchased the KPNQ shares had the fraud been disclosed. In response to the defendants' motions to dismiss, the Trust acknowledged that the third amended complaint had abandoned any claims that the defendants had "induced" the aftermarket KPNQ stock purchases. Instead, the Trust relied entirely on the theory that the defendants were liable under A.R.S. § 44-2003(A) (2003) because they had "participated in" the stock sales.

¶8 The superior court granted the motions to dismiss with respect to all aftermarket purchases. After moving unsuccessfully for reconsideration, the Trust dismissed with prejudice its claims concerning shares purchased in the IPO.

¶9 The court of appeals affirmed the trial court's dismissal of the aftermarket claims, finding that no defendant had "participated in" aftermarket sales of KPNQ stock. *Grand v. Nacchio* (*Grand II*), 222 Ariz. 498, 501 ¶ 10, 217 P.3d 1203, 1206 (2009). The court declined to decide whether the third amended complaint stated a claim for relief under § 44-2003(A) for

4

inducing the aftermarket sales because the Trust had expressly forsworn such a theory both in the superior court and on appeal. *Id.* at 502 ¶¶ 12-13 & n.5, 217 P.3d at 1207 & n.5.

**¶10** We granted the Trust's petition for review because interpretation of the Arizona Securities Act ("ASA"), A.R.S. §§ 44-1801 to 44-2126, is an issue of statewide importance. We have jurisdiction pursuant to Article 6, Section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24 (2003).

**II.**

**A.**

**¶11** This case involves the intersection of three provisions of the ASA: A.R.S. §§ 44-1991(A) (2003), 44-2001(A) (2003), and 44-2003(A). The first, § 44-1991(A), provides in relevant part that

> [i]t is a fraudulent practice and unlawful for a person, in connection with a transaction or transactions within or from this state involving an offer to sell or buy securities, or a sale or purchase of securities . . . [to] directly or indirectly . . . [e]ngage in any transaction, practice or course of business which operates or would operate as a fraud.

Section 44-1991(A) is "almost identical to the antifraud provisions of the 1933 Securities Act, 15 U.S.C. § 77q." *State v. Superior Court* (*Davis*), 123 Ariz. 324, 331, 599 P.2d 777, 784 (1979), *overruled on other grounds by State v. Gunnison*, 127 Ariz. 110, 618 P.2d 604 (1980).

5

¶12       Section 17(a) of the 1933 Securities Act, however, contains no express private cause of action. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 734 n.6 (1975) (pretermitting whether a private cause of action for violations of § 17(a) of the 1933 Act can be implied).  In contrast, the ASA explicitly provides for a private cause of action for violations of § 44-1991 in § 44-2001(A), which states that a sale of securities in violation of article 13 of title 44 is "voidable at the election of the purchaser," who may "recover the consideration paid for the securities."  "[W]hen rescission, though appropriate, is impossible or infeasible (as when the buyer has sold the property to a third party) courts may substitute rescissory damages," which are the financial equivalent of rescission.  *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 34, 945 P.2d 317, 345 (1997); *accord Davis*, 123 Ariz. at 331, 599 P.2d at 784; *Trump v. Badet*, 84 Ariz. 319, 322, 327 P.2d 1001, 1004 (1958).

¶13       The private right of action recognized in § 44-2001(A) may be pursued against "any person, including any dealer, salesman or agent, who made, participated in or induced the unlawful sale or purchase."  A.R.S. § 44-2003(A).  Section 44-2003(A) thus applies the § 44-2001 rescissory remedy to those other than the seller of the securities.  The statute has but one exception, added in 1996, which provides that "[no] person

6

shall be deemed to have participated in any sale or purchase solely by reason of having acted in the ordinary course of that person's professional capacity in connection with that sale or purchase." 1996 Ariz. Sess. Laws, ch. 197, § 6 (2nd Reg. Sess.) (amending A.R.S. § 44-2003(A)).

## B.

### 1.

¶14    In reviewing a dismissal for failure to state a claim under Arizona Rule of Civil Procedure 12(b)(6), we "assume the truth of the well-pled factual allegations and indulge in all reasonable inferences therefrom." *Cullen v. Auto-Owners Ins. Co.*, 218 Ariz. 417, 419 ¶ 7, 189 P.3d 344, 346 (2008).

¶15    The relevant allegations of the third amended complaint were described at length below, *Grand II*, 222 Ariz. at 501-02 ¶¶ 9-12, 217 P.3d at 1206-07, and can be readily summarized. That complaint alleges that Nacchio visited Arizona in 1999 and urged Richard Grand, co-trustee of the Trust, to purchase aftermarket shares without disclosing the Qwest accounting fraud. The pleading alleges similar conduct in 1999 in California by McMaster. It also alleges that KPNQ and Qwest sent various communications to Grand and the investing public, falsely describing the financial health of the joint venture.

7

¶16     The legislature intended the ASA "as a remedial measure" for the "protection of the public" and therefore specified that the act be "liberally construed."  1951 Ariz. Sess. Laws, ch. 18, § 20 (1st Reg. Sess.).  The language of the Act confirms a broad intent to sanction wrongdoing in connection with the purchase or sale of securities.

¶17     Section 44-1991(A)(3), for example, makes it illegal for any person "directly or indirectly" to "[e]ngage in any transaction, practice or course of business which operates or would operate as a fraud or deceit."  Section 44-2001(A), in turn, provides a sweeping rescissory remedy for violations of § 44-1991.  Section 44-2003(A) speaks in similarly broad terms, authorizing an action, with but one narrow exception, against "any person . . . who made, participated in or induced the unlawful sale or purchase."

¶18     This is sweeping language of inclusion.  Thus, courts are not ordinarily required to parse whether a person violating § 44-1991(A)(3) should be separately characterized under § 44-2003(A) as having "made," "participated in," or "induced" the unlawful purchase or sale.  Nor need complaints asserting claims under § 44-2003(A) ordinarily engage in such an analysis.  The Trust argues that anyone who violates § 44-1991(A)(3) is necessarily a person who "made, participated in or induced the

unlawful sale or purchase," and thus within the scope of § 44-2003(A). We assume, without today deciding, that such is the case.

¶19    The defendants do not contest that the third amended complaint alleges conduct violating § 44-1991(A). Nor do they contest that the third amended complaint stated a claim for relief under § 44-2003(A) for inducement. We agree. *See Davis*, 123 Ariz. at 331, 599 P.2d at 784 (holding Corporation Commission liable for rescission damages for misleading statements regarding regulation of insolvent corporation, which "induced" investors to purchase securities); *cf. Standard Chartered*, 190 Ariz. at 21-22, 945 P.2d at 332-33 (describing inducement as overcoming "indifference, hesitation, or opposition" by explaining the "persuasive advantages or gains" of stock ownership) (internal quotation marks omitted).

¶20    This, however, is an unusual case. Represented by able counsel, the Trust made a conscious decision, years after filing the initial complaint and after the case had once been on appeal and remanded, to forswear a § 44-2003(A) inducement theory. Instead, in its opposition to the motions to dismiss the third amended complaint, the Trust relied entirely on the contention that the defendants had "participated in" the sale of the aftermarket shares. Our task, therefore, is to determine

9

whether the third amended complaint sufficiently alleges such participation.[1]

**3.**

**a.**

¶21    In *Standard Chartered*, the court of appeals defined "participate" as "to take part in something (an enterprise or activity) . . . in common with others," or "to have a share or part in something."  190 Ariz. at 21, 945 P.2d at 332 (quoting Webster's Third New International Dictionary 1646 (1969)); *see also* A.R.S. § 1-213 (2002) ("Words and phrases shall be construed according to the common and approved use of the language."); *State v. Wise*, 137 Ariz. 468, 470 n.3, 671 P.2d 909, 911 n.3 (1983) (referring to an "established, widely respected dictionary for the ordinary meaning" of a statutory term).  Applying that definition, *Standard Chartered* held that a certified public accounting firm that had issued allegedly

---

[1]    In evaluating motions to dismiss, Arizona courts consider only the "well-pled facts," not legal conclusions. *Cullen*, 218 Ariz. at 419 ¶ 7, 189 P.3d at 346.  Thus, it is not sufficient that a pleading alleges "participation" if the facts alleged do not support that theory.

Although the third amended complaint in this case alleges that the defendants "made" the sale of the KPNQ stock, the Trust has never advanced this argument, nor do the well-pled allegations of the third amended complaint support such an inference.  It is uncontested that the Trust purchased the aftermarket stock from sellers other than the defendants.  The Trust does not contend that the brokers who made the sales were liable under § 44-2003(A), presumably in light of the exception in the second sentence.

10

misleading audited financial statements and made them available to a plaintiff who bought stock in the audited firm had not "participated" in a sale. 190 Ariz. at 21, 945 P.2d at 332.

¶22     The Trust argues that because the defendants induced its purchase of KPNQ stock, they must also have participated in the sale. It is clear that one may simultaneously induce and participate in an illegal sale. For example, when a seller persuades a purchaser to buy securities through misrepresentations, he has undoubtedly not only induced the illegal sale, but also participated in it, and, indeed, made it. *See, e.g.*, *Trump*, 84 Ariz. at 321-23, 327 P.2d at 1003-04; *Strom v. Black*, 22 Ariz. App. 102, 103-04, 523 P.2d 1339, 1340-41 (1974). But we reject the argument that the three phrases in § 44-2003(A) are necessarily coterminous. As *Standard Chartered* correctly observed, participation and inducement are commonly understood to involve separate factors. *Compare* 190 Ariz. at 21-22, 945 P.2d at 332-33 (defining inducement) *with id*. at 21, 945 P.2d at 332 (defining participation). Despite the possibility of overlap, if all inducers were thereby also automatically participants, use of the term "induces" in § 44-2003(A) would be unnecessary. We ordinarily do not construe statutes so as to render portions of them superfluous. *Williams v. Thude*, 188 Ariz. 257, 259, 934 P.2d 1349, 1351 (1997).

11

¶23    The interpretation of § 44-2003(A) offered by the Trust also conflicts with the second sentence of the statute, which provides that a person does not "participate" in an illegal purchase or sale "solely by reason of having acted in the ordinary course of that person's professional capacity in connection with that sale."  Had the legislature also intended to exempt such persons from inducement liability, it surely would have said so.  *See Champlin v. Sargeant*, 192 Ariz. 371, 374 ¶ 16, 965 P.2d 763, 766 (1998) ("[T]he expression of one or more items in a class indicates the intent to exclude omitted items of the same class.").

¶24    Like the courts below, we conclude that the conduct alleged in the third amended complaint does not describe participation in the illegal sales.  Rather, that pleading alleges that, through their acts and omissions, the defendants encouraged the Trust to buy stock from others in the aftermarket.  This is classic inducement.  *See Standard Chartered*, 190 Ariz. at 21-22, 945 P.2d at 332-33 (defining inducement).  The complaint alleges no relationship whatsoever between the sellers of the KPNQ aftermarket shares and the defendants.  Nor does it allege that the defendants played any role in the transactions between the Trust and the sellers after persuading the Trust to purchase the stock.  In contrast, in *Strom,* a case relied upon by the Trust, the defendants not only

12

persuaded the plaintiffs to buy stock, but then also drafted the sales agreement, received funds from the plaintiffs, and took a commission from the sales. 22 Ariz. App. at 103-04, 523 P.2d at 1340-41.

¶25 The third amended complaint alleges that the defendants referred the Trust to an unidentified broker. But that pleading did not assert that the broker was involved in the aftermarket sales or that the Trust ever communicated with the broker. Nor did it allege that the broker was aware of the fraudulent scheme to inflate Qwest's earnings. The court of appeals thus correctly concluded that these allegations do not constitute participation under § 44-2003(A). *Grand II*, 222 Ariz. at 502 ¶ 12, 217 P.3d at 1207.

¶26 The Trust also claims that the defendants had a financial interest in the aftermarket sales, which purportedly buoyed the price of Qwest stock. The Trust thus argues that, unlike the accounting firm in *Standard Chartered*, the defendants had a "stake" in these sales. *See* 190 Ariz. at 21, 945 P.2d at 332 (noting absence of auditor's stake in stock sales). But even if the defendants benefitted substantially from the aftermarket stock purchases, it does not necessarily follow that they also participated in the sales. Indeed, others also undoubtedly benefitted from the rising market, but that alone

13

would not establish that they participated in the aftermarket sales to the Trust.

¶27    The Trust also argues that if there is no participation liability here, innocent stock purchasers will have no effective remedy under the ASA.  To the contrary, inducement liability under § 44-2003(A) covers the precise situation alleged by the Trust.  We therefore see no warrant to stretch the definition of "participated in" beyond normal understanding.

### b.

¶28    The Trust also asserts that McMaster and Nacchio are liable under A.R.S. § 44-1999(B) (2003) because they "controlled" KPNQ.  This statute imposes joint and several liability on anyone who, "directly or indirectly, controls any person liable for a violation of section 44-1991."

¶29    The third amended complaint alleges that McMaster and Nacchio controlled KPNQ.  Section 44-1991(B), however, by its terms imposes only secondary liability; a "control" person is not liable under that statute unless the controlled entity is itself also liable.  Because KPNQ did not participate in any of the allegedly illegal aftermarket stock purchases, control person liability is not available against the two individual defendants.

14

## c.

¶30     The Trust also claims Nacchio, McMaster, and Qwest aided and abetted KPNQ's violations of § 44-1991(A)(3).   In *Davis*, we stated that such a claim has three prerequisites:

> (1) a primary violation has occurred; (2) knowledge of or a duty of inquiry with regard to the primary violation by the person charged; and (3) a necessary contribution to the underlying scheme by the person charged.

123 Ariz. at 331, 599 P.2d at 784; *see also Wojutnik v. Kealy*, 394 F. Supp. 2d 1149, 1170 (D. Ariz. 2005) (recognizing aiding and abetting liability under the ASA).   After our opinion in *Davis*, however, the legislature expressly left open whether aiding and abetting liability exists under the ASA.   1996 Ariz. Sess. Laws, ch. 197, § 11(B) ("Nothing in this act . . . determines whether or in what circumstances aiding and abetting liability exists under Title 44, chapter 12, Arizona Revised Statutes.").

¶31     The defendants urge us to hold that there is no cause of action for aiding and abetting a violation of the ASA.   *Cf. Central Bank v. First Interstate Bank*, 511 U.S. 164 (1994) (holding that no cause of action exists for aiding and abetting violations of § 10(b) of the Securities Exchange Act of 1934). We need not, however, confront this issue today.   As *Davis* recognizes, aiding and abetting liability is premised on the finding of a "primary violation."   123 Ariz. at 331, 599 P.2d at

15

784. The only basis for recovery offered by the third amended complaint is that the defendants participated in the illegal aftermarket sales. If no defendant participated in an unlawful sale, there can be no aiding and abetting liability.

**d.**

¶32 Arizona Rule of Civil Procedure 15(a)(1) provides that "[l]eave to amend shall be freely granted when justice requires." The Trust argues that, if we affirm the dismissal of the third amended complaint, we should instruct the superior court to allow the filing of a fourth amended complaint alleging that the defendants induced the Trust's aftermarket stock purchases.

¶33 We decline to do so. The Trust expressly chose to eschew an inducement theory in its third amended complaint. The Trust then sought leave to amend the third amended complaint in response to the defendants' motions to dismiss. The trial court, however, denied leave to amend because the Trust had not submitted a proposed fourth amended complaint. See Ariz. R. Civ. P. 15(a)(2) (requiring submission of proposed amended complaint with motion to amend). The Trust did not challenge this ruling in the court of appeals or in its petition for review, instead raising the suggestion that further amendment should be allowed for the first time in a passing statement in the final paragraph of its supplemental brief. *See State Farm*

16

*Mut. Auto. Ins. Co. v. Tarantino*, 114 Ariz. 420, 422, 561 P.2d 744, 746 (1977) (treating issue raised before trial court but not on appeal as abandoned); Ariz. R. Civ. App. P. 23(c)(1) (requiring petition for review to set forth the "issues which were decided by the Court of Appeals and that the petitioner wishes to present to the Supreme Court for review").

¶34    In any event, we cannot conclude that the superior court abused its discretion in refusing to allow a fourth amended complaint, given the long history of this case and the Trust's considered decision to abandon any inducement theory after years of litigation.  On the facts before us, the interests of justice would not be served by beginning anew.

**III.**

¶35    For the reasons above, we affirm the judgment of the superior court and the opinion of the court of appeals.


_____
                Andrew D. Hurwitz, Vice Chief Justice

CONCURRING:


_____
Rebecca White Berch, Chief Justice


_____
Michael D. Ryan, Justice

17

_____
A. John Pelander, Justice


_____
Peter B. Swann, Judge[*]

[*]     Justice W. Scott Bales has recused himself from this case. Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Peter B. Swann, Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter.

18