IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

In the Matter of:

A B B TRUST

BETH BATES, et al.,
*Petitioners/Appellants*,

v.

LINDI DAVIS BATES, et al.,
*Respondents/Appellees*.

No. 1 CA-CV 19-0845
FILED 5-11-2021

Appeal from the Superior Court in Maricopa County
No. PB2018-002315
The Honorable Aryeh D. Schwartz, Judge

**REVERSED IN PART, VACATED IN PART,
AND REMANDED**

COUNSEL

Davis Miles McGuire Gardner, PLLC, Tempe
By Robert N. Sewell, William J. Skabelund, Angelika O. Doebler
*Counsel for Petitioners/Appellants*

Warner Angle Hallam Jackson & Formanek, PLC, Phoenix
By Jerome K. Elwell, Philip B. Visnansky
*Counsel for Respondent/Appellee Lindi Davis Bates*

Jaburg & Wilk, PC, Phoenix
By Lauren L. Garner
*Counsel for Respondent/Appellee Paul E. Deloughery*

Tiffany & Bosco, PA, Phoenix
By James A. Fassold, Justin P. Nelson
*Counsel for Respondent/Appellee Tereked C. Reeung*

---

**OPINION**

Judge David D. Weinzweig delivered the opinion of the Court, in which Judge D. Steven Williams joined. Presiding Judge Samuel A. Thumma dissented.

---

**W E I N Z W E I G**, Judge:

**¶1** This appeal concerns an irrevocable trust that granted a trust protector sole authority to amend its terms. The question is whether an undue influence claim can be pled under the Arizona Trust Code, A.R.S. § 14-10406, against a beneficiary who allegedly exerted undue influence over the trust's elderly settlor to induce the trust protector to amend the trust.

**¶2** Austin Bates formed the irrevocable trust and named his estate planning attorney as Trust Protector. Tracy Melinda Bates, Randi Dianne Bates, Beth Bates and Marjorie Kay Bates ("Petitioners") are Austin's children and former wife. Austin married Lindi Davis Bates ("Lindi") less than two years before his death. Petitioners sued Lindi in probate court, alleging she exercised undue influence over Austin to cause the Trust Protector to amend the trust in her favor. The court dismissed the claim and removed Petitioners as beneficiaries under the trust's *in terrorem* clause. We reverse in part, vacate in part and remand for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

¶3        Because the probate court dismissed the lawsuit on motion to dismiss under Arizona Rule of Civil Procedure 12(b)(6), "we must accept" and thus recount "all material facts as alleged by the non-moving party as true." *Sun World Corp. v. Pennysaver, Inc.*, 130 Ariz. 585, 586 (App. 1981).

*The Irrevocable Trust and the Trust Protector*

¶4        In February 2016, Austin petitioned to divorce Kay, his wife of 57 years.  He was 78 years old and in declining health.  He was also romantically involved with Lindi, his caretaker.  Austin's divorce from Kay was finished in December 2016.  He then married Lindi.

¶5        Shortly before the divorce became final, Austin hired his estate planning attorney, Paul Deloughery of Magellan Law, to create an irrevocable trust.  At the time, Austin "feared the women in his life" would exert "too much pressure on him to change his estate plan" and wanted "to free himself from the threat of exploitation and the pressures of undue influence."

¶6        And so, on November 1, 2016, Austin transferred his assets into the ABB Trust ("Trust"), which generally directed that "[a]ll" of its provisions were to "be interpreted to accomplish [Austin's] objectives." Austin created the Trust "with the intent that assets transferred to the trust be held for my benefit while I am living, and for the benefit of my beneficiaries after my death," all under the Trust's "terms and conditions." Austin "had a close relationship with his three daughters and wanted to ensure their beneficial interest in the Trust would be preserved upon his death."  As originally created, therefore, the Trust directed the Trustee, upon Austin's death, to distribute 45% of the Trust corpus to his former wife Kay, 45% to his three adult daughters (collectively, "Daughters"), and 10% to Lindi.  The Daughters also would receive all "tangible personal property not disposed of by a written memorandum."

¶7        Austin selected a professional trustee, Managed Protective Services, Inc. ("Trustee"), to manage the Trust's assets.  He also designated a "Trust Protector" to "direct" and "assist" the Trustee "in achieving [Austin's] objectives" under the estate plan. *See generally* A.R.S. § 14-10818. Austin picked his attorney Deloughery to serve as the Trust Protector.

*Authority to Amend the Trust*

**¶8**     The Trust provided that Austin could not "alter, amend, revoke or terminate [its terms] in any way."  And yet, Austin authorized the Trust Protector to amend or modify the Trust: "Any amendment made by the Trust Protector will be binding and conclusive on all persons interested in the trust, unless the amendment is shown by clear and convincing evidence to have been made in bad faith by the Trust Protector."

**¶9**     But the Trust limited the Trust Protector's powers.   It explained, for instance, how the Trust Protector should interpret the Trust:

> In exercising and considering whether to exercise any power granted to a Trust Protector under the agreement, the Trust Protector should make reasonable inquiry into any matter or seek any information that reasonably bear upon the Trust Protector's decision to exercise the power.

> The Trust Protector may settle any disputes concerning the interpretation of any provision contained in [the Trust] that arise as a result of any perceived ambiguity.  In doing so, the role of the Trust Protector is to ensure that [the Trust] is construed in a manner consistent with [Austin's] estate planning objectives.

*Two Amendments and the Fallout*

**¶10**     The Trust Protector twice amended the Trust in the first six months after its creation.  In March 2017, he added an *in terrorem* clause that would invalidate the interest of any beneficiary who (a) "contests by a claim of undue influence" or "objects" to "any [Trust] amendments" or (b) "seeks to obtain adjudication in any court proceedings that [the Trust] or any of its provisions is void."   Petitioners do not contest the validity of this amendment.

**¶11**     At issue here is the second amendment ("Second Amendment"), which the Trust Protector adopted in May 2017.  This amendment eliminated Kay as a beneficiary, made Lindi the sole income beneficiary of the Trust at Austin's death, and authorized the Trustee to distribute the Trust's assets to Lindi as "advisable for any purpose."  The Second Amendment also reduced the Daughters to remainder beneficiaries upon Lindi's death and added Lindi's sons from a prior marriage as remainder beneficiaries.

*This Lawsuit*

**¶12**　　　　Petitioners sued Lindi and others in probate court.　As relevant here, Petitioners sought to invalidate the Second Amendment because it was "the product of undue influence" by Lindi.　*See* A.R.S. § 14-10406 (listing conditions that render a trust void).　Petitioners asserted this claim against Lindi, not the Trust Protector, alleging that Lindi indirectly caused the Trust Protector to adopt the Second Amendment by exerting undue influence on Austin, who, they claimed, "was susceptible to undue influence as he was in poor health, depended on [Lindi] for care and he had diminished capacity at the time the [Second] Amendment was executed."　Petitioners attached over 150 pages of exhibits to their Verified Petition and First Amended Verified Petition, including the Trust document, the First Amendment and the Resignation of Trust Protector.

**¶13**　　　　Among the attachments were an unsigned affidavit of Trust Protector Deloughery that described Lindi's role in securing the Second Amendment, and an October 2018 email from Deloughery explaining: "I think the affidavit is generally correct.　However, since you want it under oath, I would need to give some thought to the wording to ensure it is correct."　Drafted for Deloughery in the first person, the affidavit read:

> Shortly before May 6, 2017, I received a communication from Lindi saying that Austin wanted changes to the Trust.　At the time Lindi was living with Mr. Bates full time as [sic] considered herself his caregiver and mistress.

> Lindi brought Austin to my office.　Initially, Lindi did all the talking.　She demand[ed] changes to the Trust that would be in her favor.　Austin sat there next to her but said nothing.　I later asked to interview Austin without Lindi.　Privately Austin informed me that he wanted to provide for Lindi but did not want to give her an outright distribution.

**¶14**　　　　Further, according to Petitioners, though Austin had appointed Managed Protective Services to serve as Trustee, Lindi in fact managed the assets of the Trust—collecting rents from tenants, demanding they pay higher rent and trying to refinance Trust assets.　Even so, Lindi grew frustrated with the Trustee and scheduled a meeting with Austin and the Trustee's representatives in January 2018.　The Trustee's representatives later described that meeting under oath, expressing their collective "shock[]" at [Austin's] obvious incapacity."　The representatives explained that (1) Austin "was unable to speak at all due to a permanently emplaced tracheostomy tube; he was unable to open his eyes; he was sitting propped

up in a chair; he made no hand gestures," (2) Austin "was unable to speak or eat, and did not appear to be fully conscious," (3) Lindi "answered all questions put to [Austin], stating that she understood him perfectly," (4) Lindi became "visibly irritated" when told she would not receive the Trust's assets "outright" at Austin's death but would instead be an income Trust beneficiary for her lifetime, and (5) Lindi "demanded that [the Trustee] resign and stated that the terms of the Trust needed to be changed."

¶15      Lindi then contacted the Trust Protector and again demanded he amend the Trust in her favor. This time, however, the Trust Protector resigned rather than accede to Lindi's demands.

¶16      In April 2018, Lindi filed paperwork to remove Managed Protective Services as trustee and appointed her daughter's friend as the replacement trustee, even though the friend "lack[ed] any experience or education to serve as a trustee." Austin authorized the change with his thumbprint rather than his signature. He died five months later.



Col. Austin B. Bates

¶17      Lindi moved to dismiss the undue influence claim under Rule 12(b)(6), arguing that Petitioners only alleged she unduly influenced Austin, rather than the Trust Protector, and Austin had no power to amend the Trust. Lindi also petitioned to invoke the *in terrorem* clause. After briefing and oral argument, the probate court dismissed Petitioners' undue influence claim. The court then enforced the Trust's *in terrorem* clause, divesting Petitioners of their beneficial interests under the Trust. Petitioners timely appealed. We have jurisdiction. A.R.S. § 12-2101(A)(1).

## DISCUSSION

### I.    Motion to Dismiss

¶18      We review de novo the dismissal of a complaint under Rule 12(b)(6) and issues of statutory interpretation. *Conklin v. Medtronic, Inc.*, 245 Ariz. 501, 504, ¶ 7 (2018); *Nicaise v. Sundaram*, 245 Ariz. 566, 567, ¶ 6 (2019). "Arizona follows a notice pleading standard, the purpose of which is to give the opponent fair notice of the nature and basis of the claim and indicate generally the type of litigation involved." *Shepherd v. Costco Wholesale Corp.*, 250 Ariz. 511, 514, ¶ 14 (2021) (quoting *Cullen v. Auto-Owners Ins. Co.*, 218 Ariz. 417, 419, ¶ 6 (2008)) (internal quotation marks omitted); *accord* Ariz. R. Civ. P. 8(a)(2) (requiring a plaintiff to set forth "a

short and plain statement of the claim showing that the pleader is entitled to relief").

**¶19** A motion to dismiss should be granted "only if as a matter of law plaintiffs would not be entitled to relief under any interpretation of the facts susceptible of proof." *Conklin*, 245 Ariz. at 504, ¶ 7 (quoting *Coleman v. City of Mesa*, 230 Ariz. 352, 356, ¶ 8 (2012)). We "must assume the truth of all well-pleaded factual allegations and indulge all reasonable inferences from those facts." *Coleman*, 230 Ariz. at 356, ¶ 9. We do not, however, "accept as true allegations consisting of conclusions of law, inferences or deductions that are not necessarily implied by well-pleaded facts, unreasonable inferences or unsupported conclusions from such facts, or legal conclusions alleged as facts." *Jeter v. Mayo Clinic Ariz.*, 211 Ariz. 386, 389, ¶ 4 (App. 2005).

### A. Undue Influence — Arizona Trust Act

**¶20** Petitioners contend the probate court erroneously dismissed the undue influence claim against Lindi because their Petition alleged that Lindi exerted undue influence over Austin to pressure or direct the Trust Protector to amend the Trust. Lindi contends the court properly dismissed the claim because the Petition failed to allege she exercised undue influence directly over the Trust Protector, who, she asserts, was "the only person who could be unduly influenced into changing" the Trust.

**¶21** The Arizona Trust Code recognizes a claim for undue influence: "A trust is void, in whole or in part, to the extent its creation was induced by fraud, duress or undue influence." A.R.S. § 14-10406; *accord* A.R.S. § 14-10201(A) ("The court may intervene in the administration of a trust to the extent its jurisdiction is invoked by an interested person or as provided by law.").

**¶22** We interpret a statute to achieve the legislature's intent. *Stambaugh v. Killian*, 242 Ariz. 508, 509, ¶ 7 (2017). "[T]he best and most reliable index of a statute's meaning is its language and, when the language is clear and unequivocal, it is determinative of the statute's construction." *State v. Hansen*, 215 Ariz. 287, 289, ¶ 7 (2007) (citations omitted).

**¶23** Section 14-10406 does not require a claimant to allege the defendant exerted undue influence directly over the person with final authority to amend the trust; instead, it broadly states that a trust amendment is void if "its creation was induced" by undue influence. A.R.S. § 14-10406. By using passive voice, the legislature did not specify or require that the defendant exercise undue influence directly on the person with

actual power to create an amendment—only that the defendant's undue influence have "induced" the "creation" of the amendment. *Cf. Dean v. United States*, 556 U.S. 568, 572 (2009) (holding that Congress' use of the passive voice "focuses on an event that occurs without respect to a specific actor"). And though not defined by § 14-10406, "induce" is defined in the dictionary as "to move by persuasion or influence," "effect," or "cause," while "influence" is defined as "to affect or alter by indirect or intangible means." *Induce*, Merriam-Webster.com Dictionary, [www.merriam-webster.com/dictionary/induce](www.merriam-webster.com/dictionary/induce) (last visited Apr. 12, 2021); *Influence*, Merriam-Webster.com Dictionary, [https://www.merriam-webster.com/dictionary/influence](https://www.merriam-webster.com/dictionary/influence) (last visited Apr. 12, 2021). A defendant therefore "induces" a trust amendment under § 14-10406 by exercising undue influence that directly or indirectly causes an amendment's adoption.

¶24 Assuming the truth of their allegations and accepting all reasonable inferences from them, Petitioners stated a claim under § 14-10406 by alleging Lindi induced or caused the Second Amendment's creation when she exerted undue influence on Austin to pressure the Trust Protector's adoption of the amendment, including that:

- Austin "was susceptible to undue influence as he was in poor health, depended on [Lindi] for care and he had diminished capacity at the time the [Second] Amendment was executed."

- Lindi "arranged for [Austin] to meet with Mr. Deloughery and was otherwise active in the procurement and execution of the [Second] Amendment."

- On or just before May 6, 2017, Lindi "brought [Austin] to Mr. Deloughery's office and demanded that Mr. Deloughery amend the Trust in her favor."

- "Mr. Deloughery amended the Trust on May 6."

- "[T]he Trust Protector did not exercise independent judgment at all." Instead, by his own account, the Trust Protector "followed" or "acted upon" Austin's direction.

- "Setting aside the [Second] Amendment is required under A.R.S. § 14-10406, which states that a 'trust is void, in whole or in part, to the extent its creation was induced by fraud, duress or undue influence.'"

These allegations and their reasonable inferences, *Coleman*, 230 Ariz. at 356, ¶ 9, state a valid claim under § 14-10406 that Lindi exercised undue influence on Austin to pressure the Trust Protector until he approved the Second Amendment. As alleged, the amendment is void under the statute because it was directly or indirectly caused by Lindi's undue influence.

¶25 Lindi contends that Petitioners' claim is defective because it does not allege she exercised undue influence directly over the Trust Protector. But, as explained above, that argument is not supported by the statute's plain language, and this court ordinarily resists reading words or requirements into a statute. *Cf. Midtown Med. Group, Inc. v. State Farm Mut. Auto. Ins. Co.*, 220 Ariz. 341, 347, ¶ 22 (App. 2008) (courts do not "seek to create conflicting provisions with the result that the judiciary adds elements the legislature could have easily required but did not").

¶26 Moreover, Lindi's argument overlooks the Trust's terms, the relationship between settlor and trust protector and the likelihood of real-world misconduct. To be sure, the Trust gave the Trust Protector the sole power to amend the Trust. But it also directed the Trust Protector to look to Austin's preferences and desires in managing the Trust.

¶27 The Trust specifically required the Trust Protector to "assist in achieving [Austin's] objectives" and mandated that "the role of the Trust Protector is to ensure that [the Trust] is construed in a manner consistent with [Austin's] estate planning objectives." Therefore, even though the Trust Protector had final authority to approve or reject an amendment, Austin's input remained relevant, if not dispositive, under the Trust's terms. To that end, one commentator has described the role of a trust protector as "an agent [who has] been chosen by the settlor to have some level of power to guide the trustee's actions." Philip J. Ruce, *The Trustee and the Trust Protector: A Question of Fiduciary Power*, 59 Drake L. Rev. 67, 68 (2010).

¶28 Further, the Trust's express "Limitation[s] on Trust Protector Powers" required the Trust Protector to conduct a reasonable inquiry before exercising his powers and to gather all information that reasonably bore on the decision to exercise his power. If Lindi exercised undue influence over Austin in a way that limited or tainted the Trust Protector's inquiry, which caused the Trust Protector to adopt her proposed Second Amendment, she accomplished precisely what § 14-10406 prohibits— exercising undue influence to induce the creation of the amendment. If Lindi is immune from an undue influence claim here, then any defendant may avoid liability under the Arizona Trust Code by simply pressuring,

threatening and exploiting a vulnerable person to do their dirty work. At minimum, Petitioners should have been allowed to conduct discovery into why the Trust Protector decided to approve the Second Amendment.

**¶29** Because Petitioners alleged that Lindi induced the Second Amendment's creation by exerting undue influence over Austin, we reverse the probate court and remand Petitioners' undue influence claim. We express no opinion, however, on the merits of that claim or how it might fare on a complete record.

## B. *In re Estate of McCauley*

**¶30** The parties devote considerable time and space to the relevance of *In re Estate of McCauley*, 101 Ariz. 8 (1966). *McCauley* doesn't apply here. There, our supreme court examined a garden-variety common-law undue influence claim nearly 50 years before the Arizona Trust Code was passed; here, we examine a claim for undue influence under the Arizona Trust Code; there, the defendant was accused of directly misdirecting a vulnerable old testatrix into changing her will; here, the defendant is accused of pressuring a vulnerable old settlor into leaning on the Trust Protector who moonlighted as the settlor's estate planning attorney. *Id.* at 17. *McCauley* never contemplated trust protectors, much less discussed their status in an undue influence claim. *See Ontiveros v. Borak*, 136 Ariz. 500, 504 (1983) ("[T]he common law, which is judge-made and judge-applied, can and will be changed when changed conditions and circumstances establish that it is unjust or has become bad public policy. In reevaluating previous decisions in light of present facts and circumstances, we do not depart from the proper role of the judiciary."). In fact, *McCauley* was decided in 1966—26 years before the words "trust protector" first appeared in recorded decisional law, *In re Colburn*, 145 B.R. 851 (Bankr. E.D. Va. 1992). Again, *McCauley* is not relevant here.

## II. *In Terrorem* Clause

**¶31** Based on its dismissal of Petitioners' undue influence claim, the probate court enforced the *in terrorem* clause, removing them as beneficiaries of the Trust and dismissing their other claims for lack of standing. Because we reverse and remand the dismissal of Petitioners' undue influence claim, we likewise vacate the court's application of the *in terrorem* clause.

## CONCLUSION

¶**32**　　　For the reasons above, we reverse the probate court's dismissal of Petitioners' undue influence claim, vacate the court's enforcement of the *in terrorem* clause, and remand for further proceedings consistent with this opinion.

**T H U M M A**, Judge, dissenting:

¶33 The Majority correctly notes that the Trust was irrevocable upon creation in November 2016. Austin could not "alter, amend, revoke or terminate" the Trust at any time after its creation. As noted by the Majority, Petitioners do not challenge the March 2017 amendment and the Trust Protector refused to make a requested February 2018 amendment. The sole issue is whether Petitioners have alleged a viable undue influence claim for the May 2017 Second Amendment to the Trust.

¶34 In challenging the Second Amendment, the Majority states Petitioners allege that Lindi "caused the Trust Protector to adopt the Second Amendment by exerting undue influence on Austin." Austin, however, had no authority to make the Second Amendment. Only the Trust Protector could do so. And I do not read the operative Petition as alleging that Lindi exercised undue influence over the Trust Protector, an essential element for the claim Petitioners seek to assert here.[1] Thus, the undue influence claim fails to state a claim upon which relief can be granted. I reach that conclusion based both on what Petitioners have not alleged, and the undue influence claim Petitioners have alleged.

## I. What Petitioners Have Not Alleged.

¶35 Only the Trust Protector had the authority to make the Second Amendment. As noted during oral argument before this court, Petitioners have never asserted or tried to assert any claim of: (1) undue influence by Lindi over the Trust Protector, the only person with the power to amend the Trust and who made the Second Amendment challenged by Petitioners; (2) aiding and abetting or a civil conspiracy, alleging the Trust Protector was part of, and is legally responsible for, Lindi's alleged undue influence of Austin; (3) other joint or concerted action alleging the Trust Protector should be responsible for Lindi's alleged undue influence over Austin or (4) bad faith by the Trust Protector, the standard the Trust establishes for Trust Protector liability. *See* Trust § 4.11(a) (Trust amendments are "binding and conclusive . . . unless the amendment is shown by clear and convincing evidence to have been made in bad faith by the Trust Protector.").

## II. Petitioners' Undue Influence Claim.

¶36 The undue influence claim Petitioners allege — Count 3 in their First Amended Petition (FAP) — contains three operative

---

[1] This presumes that a trust protector can be subject to an undue influence claim, an issue that need not be resolved here.

paragraphs.[2] There, Petitioners allege Lindi exerted undue influence over Austin but not over the Trust Protector. Examining those allegations shows that Count 3 fails to state a cognizable undue influence claim under Arizona law.

¶37        FAP Paragraph 145 alleges the following**:**

> The [Second] Amendment is presumed to be the product of undue influence under A.R.S. § 14-2712(E)(l), because [Lindi]: (1) had a confidential relationship to [Austin]; (2) was active in the procurement, the creation and the execution of the [Second] Amendment; and (3) she is the principal beneficiary of the [Second] Amendment. The circumstances surrounding the Amendment display many of the factors pointing to undue influence identified in *In re Estate of McCauley*, 101 Ariz. 8, 10–11 (1966).

¶38        At best, these appear to be legal conclusions that are not relevant in deciding a motion to dismiss. *See Grand v. Nacchio*, 225 Ariz. 171, 175 ¶ 20 n.1 (2010) ("In evaluating motions to dismiss, Arizona courts consider only the 'well-pled facts,' not legal conclusions."). Moreover, reliance on the statutory presumption of undue influence appears misplaced, given Petitioners do not allege Lindi had a confidential relationship with the Trust Protector, who made the Second Amendment. *See also* A.R.S. § 14-2712(E)(1) (recognizing presumption of undue influence if "[a] person who had a confidential relationship *to the creator of the governing instrument* was active in procuring its creation and execution and is a principal beneficiary of the governing instrument") (emphasis added).

¶39        The Majority provides good reasons for why *McCauley* should not apply here. Indeed, Petitioners' counsel conceded at oral argument that she knew of no case authorizing a claim like that pled in Count 3. Nor have I found any. More broadly, I have found no case under Arizona law recognizing an undue influence claim that does not allege undue influence over the person or entity that had the power to, and then did, create or change the challenged document.

---

[2] The last paragraph of Count 3 is the prayer for relief, which is not relevant for purposes of Rule 12(b)(6). *See Citizens' Comm. for Recall of Jack Williams v. Marson*, 109 Ariz. 188, 192 (1973) ("[I]n considering the sufficiency of the complaint to state a claim for relief, the prayer is not part of the complaint").

¶40            FAP Paragraph 146 alleges that Austin "was susceptible to undue influence as he was in poor health, depended on [Lindi] for care and he had diminished capacity at the time the [Second] Amendment was executed." Accepting this as true, Petitioners do not allege that Austin executed the Second Amendment or that he had the power to do so. Instead, it was the Trust Protector who had that power and executed the Second Amendment. But again, Petitioners do not name the Trust Protector in Count 3 and do not allege that Austin's susceptibility to undue influence at the time of the Second Amendment somehow meant the Trust Protector was susceptible to Lindi's alleged undue influence.

¶41            FAP Paragraph 147 alleges "a presumption of undue influence due to [Lindi's] activity in procuring the Amendment and being named as a principal beneficiary. (See A.R.S. 14-2712(E) and *McCauley* at 11, 34.)." These appear to be legal conclusions that are not relevant in deciding a motion to dismiss. *Grand*, 225 Ariz. at 175 ¶ 20 n.1. Moreover, the presumption in A.R.S. § 14-2712(E)(2) does not apply, given that Petitioners fail to allege Lindi prepared the governing instrument. A.R.S. § 14-2712(E)(2) (proving for a presumption of undue influence if "[t]he preparer of the governing instrument . . . is a principal beneficiary of the governing instrument).

¶42            Nowhere does the FAP allege (1) undue influence by Lindi over the Trust Protector that caused the Trust Protector (the only person with the power to amend the Trust) to make the Second Amendment or (2) undue influence by Lindi over Austin that, in turn, caused Austin to exert undue influence over the Trust Protector to execute the Second Amendment. The lack of such allegations is significant, given that Petitioners have filed two pleadings spanning (with attachments) more than 400 pages. Moreover, Petitioner filed their FAP *after* the filing of the motion to enforce in terrorem clause. Why Petitioners have not made such allegations (or perhaps are unable to make such allegations) in their two long pleadings is unknown to me. But they did not do so, and they have not tried to file another amended pleading. It is the lack of those allegations that result in Count 3 failing to state a claim upon which relief may be granted.

¶43            For these reasons, I respectfully dissent.

